Good afternoon. May it please the court, my name is Jack Dean, student attorney on behalf of RISE St. James. I will address why plaintiffs sufficiently allege standing and my co-counsel, Ms. Spees, will speak to the timeliness of plaintiffs' claims and to the extent this court deems appropriate, additional grounds raised by defendants not reached by the district court. Ms. Spees is also reserved four minutes for rebuttal. So this case challenges St. James Parish's longstanding discriminatory policy of citing heavy industry in majority black districts while excluding majority white districts from those same arms. The district court correctly found plaintiffs had standing for five of seven claims, but there's just one thread running through the district court's standing errors. The court failed to read all well-plaid facts of the complaint in the light most favorable to plaintiffs. I'll address three of the district court's standing errors. So first, plaintiffs sufficiently demonstrated that the parish, not just third parties, caused religious injuries. Second, plaintiffs concretely demonstrated that the parish denied plaintiffs equal treatment, giving rise to stigmatic injury. And third, all three plaintiffs sufficiently alleged the parish's actions harmed their properties. Turning to the first error, traceability of religious injuries. The question here is when the parish permits industrial facilities that harm or threaten burial sites, is that harm traceable to the parish under the Religious Land Use and Institutionalized Persons Act and Louisiana Constitution? The answer is undoubtedly yes. The court erred in its traceability analysis because it misread the injury in fact from the very start. Plaintiffs' religious injuries are not just about lack of access to grave sites, they're about actual and threatened destruction, desecration, and profanation of grave sites. Lack of access is another. They still claim that that was just done by private people, so then why you, then their argument is why can you sue us because this was done by private people? Absolutely, Your Honor. So we can move directly to traceability. The court incorrectly narrowed the scope of injury here, but looking at lack of access and actual or threatened desecration, the question is when the parish permits industrial facilities to construct, is that harm that occurs to those cemeteries ultimately traceable to the parish? Undoubtedly yes. Looking at Supreme Court precedent, Bennett v. Speer, the parish need not be the last step in the chain of causation. That's the language from Bennett. It's enough for the 12b1 stage that plaintiffs pled without the parish's approval third parties could not construct industrial facilities in such a way that they've harmed these religious sites. So whether that be the actual destruction. I mean if the state gives Mr. X a driver's license and then he drives off and runs into someone, that doesn't mean that's the state's liable for that even though they're the ones that gave the driver's license, right? So I mean there's all kinds of things that states and parishes entities within the state give that then that person walks down a road that isn't very good or drives down one. That doesn't mean they're liable, so can you connect it a little bit more? Absolutely, Your Honor. So I think the recent FDA versus Alliance for Hippocratic Medicine case is actually very instructive. There Justice Kavanaugh framed tracing or threading the traceability needle as asking regulated third parties must be likely to act in predictable ways that in turn will likely injure plaintiffs. So giving a driver's traceability between someone getting their driver's license and hitting someone, the state doesn't have that connection. It's a very attenuated connection there. Here the parish gives industrial permits. Are industrial facilities that receive those permits then likely to construct on sites that cemeteries are found? Undoubtedly yes. There's a direct traceable link there between the parish's siting decisions and the construction that third parties engage in, and that harms plaintiff's religious sites in which they claim interest. So turning to the second standing error, unequal treatment and the stigma from it accords an additional basis for standing for plaintiffs. As alleged in paragraph 347 and throughout, quote, the parish has not allowed heavy industrial facilities in majority white parts of the parish in over 46 years, and today 20 out of the 24 heavy industrial facilities approved by the parish are located in the majority black fourth and fifth districts, end quote. The parish continues to intentionally steer heavy industry into these districts. It just disputes the steering warrants stigma. But looking to the Supreme Court and Heckler v. Matthews, there the court recognized stigmatic injury as a basis for standing. Discrimination that perpetuates archaic notions, quote, stigmatizes members of the disfavored group as innately inferior and therefore as less worthy participants in the political community, end quote. Much like Heckler, plaintiffs affirmably requested protection from the parish and were denied that protection from their elected officials. Looking directly to the complaint, paragraph 288, the parish's land use plan, quote, failed to apply any buffer zones to Baptist and black churches or to schools in the majority black parts of the fourth and fifth districts, end quote. At paragraph 289 of the amended complaint, the parish placed restrictions on the subdivision of residential properties in majority black districts that were not applied elsewhere. These are examples of the decades-long policy, practice, and custom of treating plaintiffs as unequal and unworthy of the same protections as white residents. These aren't broad allegations, as the district court seemed to characterize them. Plaintiffs themselves have suffered unequal treatment. And moving to the third standing error, the district court found that inclusive Louisiana plausibly alleged property injury and that the parish, that that injury was traceable to the parish. Rise St. James and Mount Triumph, Louisiana, pled similar allegations and showed that they had injury in fact and that injury was clearly traceable to the parish. Rise St. James's members Sharon Levine and Gail LaBoeuf urged the parish council for an industrial moratorium because of industrial siting in the fourth and fifth districts that caused, quote, depreciation of their property values. That's record on appeal page 685. At paragraph 594 of the amended complaint, the complaint states that the parish approved siting of Aragon Tank Farm 500 feet from Mount Triumph Baptist Church. From these facts, is it plausible that defendant site incisions harm plaintiff's property values? Undoubtedly yes. May I briefly conclude in a line, Your Honors? So you're just arguing that you have the standing points, is that what you're saying? That's correct, Your Honors. If I may conclude in just one line. Go ahead. The amended complaint thoroughly weaves together plaintiff's concrete injuries and their traceability to the parish. When the light most favorable to plaintiffs, they plausibly allege standing for all claims. Thank you. All right. Thank you, sir. Good afternoon. Pam Spees for Plaintiffs Inclusive Louisiana and Mount Triumph Baptist Church. As Mr. Dean said, this case challenges a longstanding policy and practice of siting heavy industrial facilities in predominantly black districts in St. James Parish, a policy that preceded the 2014 land use plan, which the district court found to be a triggering point and that extended far beyond. What about this argument that the 2014 land use plan was voted for unanimously, including people from these districts that are majority black? Is that true? I believe it is, Your Honor. Well, then how is that so, given the concerns about this 2014? Well, it doesn't, just because it was voted on unanimously doesn't mean it's not a discriminatory document. But why would you discriminate against yourself? Well, Your Honor, that's, this is, it's, there is a, there, the discrimination here, it is done by the parish, the government entity, and it's based on a long, at that point, it was based on a long standing pattern of discrimination. The land use plan ends up being amended in 2018 to, to basically delete some of the most obviously discriminatory elements of the 2014 plan, the explicit racial preferences and religious preferences and the buffer zones. And what begins to happen after 2018, it takes a while to understand what, what's, what's happening, but what we learn through hindsight largely is that the parish was still following the blueprint that was set out in 2014, in the sense that it is still adhering to these now invisible buffer zones. Because in 2018, in the complaint, we set all of this out in the complaint, the, the buffer zones disappear, but the parish is, these, these companies are supposed to report on public parks, schools, and, and, and places that are within the two mile impact areas of these facilities. And what we see is that when it comes to these sightings in, in the fourth and fifth districts, the parish is even overlooking that. And, let me ask you this. Yes, Your Honor. Part of the issues are those errors, but of course, the 2014 land use plan, if I understand the parish's argument, putting aside, you know, they disagree with what you're alleging, but they would argue the core of all the claims made stem from the 2014 plan. Ergo, whatever time limitations there may be, 2014 plan is, is it. I mean, that's the focal point. And so, you agree, or others argue, no, that's one set of claims, but not all, or argue that there are continuing violations. So, address, if you will, their argument that whatever merit or lack thereof of the claims, 2014 needs to be the focus point, time-wise. So, how do you address, you know, that issue in addition to, whether it's a continuing violation or whatever, when, when is the starting point? How do you, how do you address those? So, thank you, Your Honor. In, in, in terms of the, the 2014 land use plan, what we have said is that, that, that provides clear evidence of an intent to discriminate. And, it ends up being amended in 2018. And, one, one, it would be reasonable for someone to assume that once the religious preferences are taken out of the plan, and the buffer zones disappear, that there might be a fairer application of this land use plan. But, that's not what happens. And, so, what we plead is that what you, what you're seeing is this differential treatment for facilities trying to locate in the fourth and fifth districts, versus those that are trying to locate in the predominantly white areas of the parish, where you have strict enforcement of the land use plan, and then very lax enforcement of the land use plan when it comes to the facilities in, in the majority black parts of the parish. The, we think that, that this Court's decision in Texas v. United States, and this is the 2018 decision that the District Court cited, which, which Your Honors, Judge Haynes and, and Judge Higginbotham presided over, is instructive. Because in, in that case, the Court is saying that one, one of the ways you determine whether the continuing violation doctrine applies is to look at the intent, the statutory language, and the intent of the statute. And, in that case, it was also looking at agency interpretations. And, what we're operating with here is a remedial statute, Section 1983, which was intended to, to be a vehicle to address these types of continuing, persistent and widespread discriminatory acts by state officials. And that's coming from Monell, which revisited the history, the legislative history of that, of that act, and in, in determining that local governments, municipalities could be held liable, but only for policy, acts that are part, are pursuant to official policy. And so, here we, we are talking about widespread, persistent discriminatory actions by a local government. Squarely within Monell, 1983, I mean, basically, because of what it was intended to address, contemplates continuing violations. Well, the Supreme Court has stated continuing violations should be applied sparingly. The Texas case you cited, my recollection was a summer judgment case, not a 12 v. 6, as we have here. But, thinking about the writing says, well, when the statutory terms set the times, then continuing violation doesn't apply. I don't know if you're arguing that or LUPA does or doesn't in terms of that. So, my question is, how do you fit in this, the continuing violations argument, which has been used most in employment since, but we do have cases where it's outside. The Texas case, that was a nuclear regulatory. So, say specifically, I know it's in the brief, we read it, but as I said, they argue everything is 2014. So, what's your case that this is the exception to being continuing violations? Well, we think Morgan reiterates, yes, it's an employment context, but Morgan reiterates that when you have a continuing violation, where the harm is still continuing, that that's what the continuing violation doctrine is intended to address when it's all part of one whole. But, even if we have a discrete act claim, even if this were cast as a discrete act, this case would still be timely because we have discriminatory acts within the limitations period, and that's the 2022 decisions to grant a moratorium on solar farms and to deny a moratorium on heavy industry in the 4th and 5th districts. The Heath, this court's ruling in Heath is also constructive because Heath says that there's no notice requirement, and at that point, when that it's not reasonable to require a notice requirement when you are dealing with something that is continuing and ongoing, and it could be the case, and here's another reason why the land use plan is not a discriminatory act. So, the relief requested is to, basically, part of it is invalidating the discriminatory aspects of the land use plan, but it's more holistic than that because, as even the defendants acknowledge, invalidation of the 2014 land use plan would not redress plaintiff's harms fully because some of this could still happen in less formal ways. So, part of the relief is... You already have plants in place working and admitting whatever they admit, and you search, you ask for a cessation of the ongoing discrimination. That I understand, but what do you do about the plants that are already there? Well, your honor, one of the relief requested is to have ensure that the parish is in consultation with members of the community about more air monitoring, more data sharing, so that people can protect themselves. That has to do with what's ongoing, but this case, you're right, your honor, is about stopping the oncoming traffic into the parish, into the fourth and fifth districts. So, you're saying, basically, for the extent plants do moderation, more responsive to the emission of harmful emissions, but also, you want to stop the allocations in the fashion that have gone before. Is that it, or? I couldn't hear the last part of your honor's question. Apologies. Well, I'm sorry. What I'm saying, asking you, is in terms of relief, you have here a situation where you claim that these argue that the allocation here has been along the lines of race and also along the lines of religion, favoring the Catholic Church, that you want to... That should stop. Okay. I assume for the moment that the court orders that cessation. The plants are still there, doing what they're doing. And my question is, what ultimate relief do you seek? And as I understand what you were saying, is that you want them, under an injunction, to be more sensitive to any future allocations, but as for the plants that are already there, you would then seek further monitoring, more sensitivity to moderation of what's there. Is that correct or not? Correct, your honor. That is part of the relief sought. And I see my time is up. I can reserve the rest of my comments for rebuttal, unless there are further questions. Okay. All right. Thank you. All right. Ms. Borrell, you're up first. Good afternoon, your honors. I am Dani Borrell, and I represent the defendant, St. James Parish, in this matter. I will address the appellant's assignments of error number three, four, five, and six, those that deal with the standing issues. And my co-counsel, Mr. DeVilliers, will address assignments one and two that deal with the prescriptive period issues. Addressing assignment of error number three first, the question before this court is whether the district court correctly found that the appellants and the plaintiffs lack any property rights or property interests in their re lupa and Louisiana constitutional claims to pursue against the defendants as far as their right to worship on what may be unmarked burial sites. And the district court correctly found that the plaintiffs do not have any property rights that support their request against the defendants. In that sense, the district court correctly found that they lacked standing. They could not allege causation and traceability against the defendant. Re lupa itself is very clear that to bring a claim under re lupa, you have to have a property interest in the subject property that you are seeking to address by the government action. Here, you're missing both elements. There is no property interest and there is no government action. The district court is also very clear, and we certainly agree, that the actions that are complained of by the plaintiffs and the appellants are not actions of the defendant, St. James Parish. They have not pled or alleged that St. James Parish owns any of the property with these unmarked burial sites, nor does the parish. Okay, but if you have this burial site and the parish says, oh sure, you can come in and bang it all you want, isn't that allowing the banging? Isn't that the parish causing the banging because they're letting the private come in and bang? No, your honor. While the parish may permit industrial building, whether a private landowner is aware of and then disturbs an unmarked burial site is not something that's under the purview of the parish, nor is the permit alone a direct cause to upsetting of a burial. That's something that we see in the syngas allegation of the petition. There was a permit issued by St. James Parish for the syngas plant. That plant never got built. The industrial permit alone is not sufficient for any construction to actually occur. It's one procedural step of a process, but it's also not the direct cause of construction. In fact, when you read the complaint, you see several claims in plaintiff's complaint that details other paragraphs of what they allege are unmarked burial sites that were disrupted that have no connection to the parish. They talk about a pipeline being built through an unmarked burial site. They talked about a prior owner having a pit. None of these are actions that are sanctioned by the parish government. Well, I can't help but to be remembered that we're at the 12B6 stage, 12B1. Those other cases cited, they were summary judgment cases. I mean, this isn't a bare bones complaint like we see a lot in this court. I mean, there's 280 something paragraphs. I mean, it goes on. We toss cases 12B6 bare bones. They get them in two or three times. They don't say anything more. Here, it hardly can be said it's bare bones. And so, to some degree, it seems the argument made is not construing the complaint in the light most favorable to the plans in an admittedly very difficult area of the law and saying, well, they didn't prove X. Well, it's at 12B. They don't have a burden to prove. The test is plausibility. I know Twombly was an antitrust case, but it's plausibility. So, ergo, what's your best 12B6 case construing our LUPA at this stage that tosses the plaintiffs out the door? I'm not saying whether you win at Rule 56. I don't mean you personally, but the parish wouldn't rule, you know, win at summary judgment. You didn't prove this. They don't have any personal interest. All of that. Rule 56 is, you know, they're the regular stock. This is 12B at the door. They have an amended complaint, 285 paragraphs. How are they supposed to know at the pleading stage all these intricate issues that the parish will meaningly say is King's X? First, Your Honor, when the complaint was amended, we had already filed our very long and detailed motion to dismiss. So, the plaintiffs had our original motion to dismiss prior to their amendment and failed to add additional allegations that would have addressed the issues. I got that. You can't file additional allegations beyond what you know at the pleading stage. That's the point. Agreed, but there is no discovery that will create a property interest right which will allow them to bring this way LUPA, a Louisiana constitutional claim. I mean, you may well be right. You may be correct. I admit it. I'm stuck. We're at 12B, which is a threshold to get into court. And we have very strict rules, you know, on 12B, which you can't just frivolously throw something up there. But as I said, I'm struck. This is the amended complaint. It's 280-something paragraphs. And so, the pushback is, well, you didn't allege this. Or you can't show who is buried there. Or you can't show this and you can't show that. And so, I'm just sort of asking, you know, how much is it supposed to be able to show when you want a thousand-page complaint? I'm being facetious, but you understand what I'm saying. It's this balance between it's at the threshold stage and is the complaint being construed in a light most favorable to the plaintiffs in terms of some of these allegations. And that's, you know, I just, I mean, you make a strong argument. But if my question was construing our LUPA and the component state-wise, and I'll give you some time back for sucking up the time. But I'm just clear on what's our LUPA is one of those we don't get them every day. You know, it's infringing on religious rights. And we go real slow when we get them because of the paramount concerns about religious threat. So, I'm just wanting to know what's the best case on the parishes side construing or upholding a 12b6 dismissal. Apache Stronghold, your honor, is the clearest case discussing that Ray LUPA does not give plaintiffs any sort of property rights if they don't already have. Particularly, the case says, put simply. Before I forget, give counsel two minutes. I put simply, neither statute, it was discussing Ray LUPA and another statute, purports to grant persons a religious servitude over the property of others. 12b6 or summary judgment or trial without a property interest, the plaintiffs do not have a case or causation or redressability against St. James Parish under Ray LUPA or the Louisiana Constitution to bring these claims. And 12b1, as we're discussing here, is designed to stop these claims short so that the St. James Parish does not have to incur the expense of taking this to trial to prove what we already knew, that there's a lack of property interest right to support standing from the very beginning. That's the same rationale why the Louisiana Constitutional claims were dismissed. As is the same rationale while under assignment number five, the district court correctly dismissed those claims brought by Mount Triumph and rise for a lack of property interest. Again, like you stated, this is not a bare bones complaint. And it was one that was amended and was done so with the benefit of having all of our arguments in hand. And the allegations were, we believe, construed in the light most favorable to plaintiffs. They simply don't meet the bar necessary to provide standing. Specifically in assignment of error number five, when we're when you read the actual allegation pled, not how it's argued in briefs, it is insufficient. These are the actual allegations pled. In their letter, they pointed out the compelling and urgent reasons regarding the need for a moratorium, including the alarming rates of cancer and other illnesses associated with pollution from area industry and depreciation of their property values. That's the one paragraph that they're hanging their hat on to say Mount Triumph and alleged a decrease in property. That one paragraph says at a council meeting, some members wrote a letter to the council and this is what the letter might have said. That is not a clear factual allegation which plaintiffs had all opportunity to provide and did not. So construing that specific language in the complaint in favor of plaintiffs, it's insufficient to show standing. We also find that as mentioned by opposing council, the Supreme Court has been very clear on the importance of Article III standing to the claims made. We agree that the FDA versus National Alliance of Medicine case, the June 2024 Supreme Court case, strengthened and reaffirmed the importance of Article III standing. And we believe the notions in the recent Supreme Court decision only support our position and the district court's finding that they do lack standing because of a lack of causation. For both Claim 5 and Claim 7, Mount Triumph and Rise have not pled property injuries and a general stigmatic harm or unequal treatment is insufficient to show standing because again it lacks an injury, the very first element required by Article III. My co-counsel will address Assignments 1 and 2. All right. Did you get your . . . you got all your points in? Yes, sir. Thank you. All right. Thank you. All right. Mr. Duvillier. Thank you. May it please the Court, Your Honor. Carroll Duvillier. I will be handling the prescription piece of this case. My opposing council, the case they chose to discuss is interesting because it's the case I was starting with, which is Texas versus United States. And that's a Fifth Circuit case from 2018. And what it says is, the Supreme Court has stressed that the equitable version of the doctrine should be invoked sparingly only when the situation calls for it. We have heeded this instruction as we have repeatedly held generally in determining if equitable tolling is appropriate. We focus the inquiry on what event in fairness and logic should have alerted the average lay person to act to protect his rights. That's what gets skipped by the plaintiffs, frankly, in this discussion of prescription and in the appellate brief and at the trial court, is they skip the test. They skip the fairness and logic test that this court has recognized for years. And they jump into the discussion of continuing violation. And they jump into the discussion . . . But, I mean, if X was punching Y every day for the last 10 years, Y maybe can't sue him for 10 years ago. But what about for yesterday? The last discreet act punch? The punch from yesterday? Sure. Fire away. They have some points that they say were done in the last year. So that even if that's all we can have, we couldn't do everything under the sun, they have some stuff that they can cubby. Now, why doesn't that at least get it past the 12B? As Judge Stewart points out, we keep, you know, we're just in the very beginning. Yeah. And I'll say here's why. Because if X punched Y every day, every single day, then yes, you can file a new suit for the last punch. But if X punched Y in 2014, and Y's face still hurts today, he's not timely to sue Y for that punch. And what the trial court realized is that the 2014 land use plan, as pled by the plaintiffs, was the triggering event on which their claims accrued. And you don't have to take my word for it. When you look at their complaint, when you go to paragraphs 275 through 296 of their complaint that are at pages 1072, they identify the complaint, I'm sorry, the 2014 plan as a racial cleansing plan. They describe what it does here. And their description of it is their entire case. Having a rule that agrees to discriminate doesn't mean that if you don't sue within a year, well, you can be just discriminated the of your life. That seems a little odd to me that that could happen just because, oh my gosh, I didn't realize it was only a year. I sued after a year and one day. Well, now I can be discriminated the rest of my life. That's what the person would have to say. Is that what you're claiming? What I'm claiming is that the Fifth Circuit case of Hearn, which is a 2021 decision, dealt with a situation where sex offenders filed these same claims arising out of the registry requirements that they require every year. And what the Fifth Circuit said is that the initial act, your knowledge and awareness of the act was the passage of the act that required your required you to re-register. It is a continuation of the plan. And Judge, look. But that's a little different. One registration or having to update your registration is a little different from, okay, this discrimination, that one, this one, that one, all the flopping around, and they copy some within that year. Again, I'm not saying I necessarily agree or disagree. I'm just trying to understand y'all's argument that basically makes it sound like if you didn't sue within a year, well, heck, you can be discriminated against in a bunch of different ways for the rest of eternity. Well, and see, Your Honor, I look at it from the converse position. But to take your question, every time there's a ruling and there's a permit request in St. James Parish, any plaintiff, any resident can show up and challenge the permit and appeal the permit and participate in the process. The converse of that, Judge, is that this plan has been in place since 2014, even as amended in 2018. And on the face of the complaint, these are not plaintiffs who sat idly by and had no idea that was happening. They participated in the process. They have pled in their complaint so that the issue is properly before the court on 12b. They're knowing involvement throughout all of these processes. So they're not idly by and then coming to the forefront and being like, well, we missed the window, so we're carved out of this. They're involved in it. But additionally, the converse of that is, what's the alternative? You have a land use plan. It's in place for 10 years. You get a decision. You find out about it. You can now claw back indefinitely into the past, even though you've known about that plan all those years. And, Judge, it's one thing if there's a plan and you say it's, I can't tell it's discriminatory on the face. Oh, now it's been applied in a discriminatory fashion. They have described this as discriminatory on its face and that the plan itself was, quote, distilled the pattern or practice into a codified document. There could be things that are past the statute of limitations, but they claim some things within the year. And that's what I'm trying to understand. Even if we end up saying, no, you can't go way back, why can't we say, oh, you can go within the year? Well, I'm sorry. So let's talk about what's happened, what they claim is within the year, which some of them are not in the complaint at all. They tried to add new stuff. The Fifth Amendment wouldn't even allow them to file the new stuff. But let's talk about the three things they say that put them timely for all three of these claims. And look, claims 1, 2, 3, and 4, they're 1982 and 1983 claims. Those are all a year. RILUPA is four years. RILUPA is the fallback federal four-year plan for that discriminatory act. So what they claim, they point to Syngas, the Syngas permit. But in the complaint, there is no allegation that Syngas ever built anything or developed anything. Syngas just got a permit. To have a continuing violation, you have to have an act and a harm. There is no alleged harm from the Syngas approval, none. I'm going to butcher this name. It's Wanhua is the second permit issue. I'm sure I'm saying that improperly. There is an allegation in the complaint that it was permitted. There's also an allegation in the complaint that specifically says Wanhua withdrew and never built anything. The third thing, the solar farm. What's alleged with regard to the solar moratorium is that St. James put into a place a moratorium that didn't allow solar farms anywhere in the parish. Well, certainly you can't allege to have a harm from, one, it can't be discriminatory because it applies to every district. And two, there is no harm because there is no development. And all of their claims arise from the alleged industrial development. The fourth thing is September 9th, 2019, they sent a letter to the parish requesting a moratorium on all industrial development. And you just heard my opposing counsel mention the fact that these claims arise out of official acts. There is no alleged official act of the parish with regard to that September 2019 letter. It was never placed on an agenda. It was never voted on at a parish meeting. It was never formally considered. It has not been arisen. So the issue with what's, if you even try to take discrete acts and say, okay, you don't have a cause for everything else, what do you have within the last year? They have nothing because they don't have a claim within the last year that asserts both an act and a harm. And more importantly, without a continued act and a continued harm, you can't do what they're really trying to do here, which is claw back 10, 20 plus years. And if you look at what they've requested as far as their relief, it's broad and it's widespread and it is an attempt to this land use planning in St. James Parish. So it's much further than just fix the plan. There are specific targets in the prayer for relief. There's specific plans of how they plan to take that over. I addressed the Hearn case because I do think it is, I paid attention during the first argument, so I wanted to know what was my favorite case. I looked at the complaint. They don't, they don't plead to shut the plants down, do they? They don't. There's two permits specifically they plan to have drawn back. One is Methanex and the other one is Formosa. I believe those are the two they pointed having those permits withdrawn. But what I do see is an intent here to have under the guise of having some involvement, have more control over the existing plants, which that's not what the parish does or ever did. And that's part of what Ms. Borrell was discussing with the causation element is we have a finite start and end point to our permitting process. But then other state agencies regulate the emissions that come from the plants. That's beyond the scope of what we do and beyond the scope of what we've ever done, which ties into the causation piece. Sorry, I thought you were, did I take a moment? The other thing that strikes me is this attempt to tie us to the continuing violation doctrine that's throughout these things. There's a reason that claim has been utilized in the hostel work environment and in the Housing, Fair Housing Act. Those claims, those plaintiffs have to prove a pattern of practice. So in their claims, they would not have a date certain within their pattern of practice. And that's what this court and what the Supreme Court have recognized in the National Railroad case is that it would be untenable to have a plaintiff who's required to show a continuum of behavior put a date certain on the claim. It would certainly be untenable for a plaintiff who is required to prove pattern of practice to have their prescriptive period start on the front end of that. Well, in this case, these plaintiffs are not required to prove that. Plaintiffs in 1982 and 1983 claims, they can have discrete act cases. And in this case, we have specific discrete acts. The complaint is replete with dates with identified discrete acts leading up to 2014. And then as the plaintiffs put it, that whole theory of discriminatory behavior that predated 2014 is distilled into their plan. And from that point forward, everything else, every permitting decision we make is pursuant to a land use plan. And so what the continuing violations doctrine has looked at is that it's one thing to have continuous acts. It's another thing to have acts with discrete dates and then have continuing harms to have the implementation of that plan. That's what they looked at in Hearn. If you have all of the discriminatory alleged behavior distilled into a codified plan, then thereafter the implementation of it is not a new act. It is not a new harm. It is simply the implementation of the one existing act. We also have the Jones v. Lumpkin case, which is similar to this as well, only in the sense that you have a prisoner case there making. You urge, well, not simplifying, but essentially the 2014 plan is the focal point from the standpoint of the parents that all these other claims made, the 2014 plan and time period is really the triggering event, for lack of a better way of putting it. If you're looking for an accrual date, we urge that it is the focal point. But also, I think if you review the complaint, it is the focal point of the complaint. When you get to, from a standpoint of the fact that this is a suit alleging discrimination, equal protection claims, RILUPA claims, you have in the complaint, starting at paragraphs 275, the identification of each of those claims based on the face of the plan. And so that the entirety of the plaintiff's case arises out of, is supported by, and is raised, and they are aware of it in 2014. And so in fairness and logic, with that description, for you to describe the 2014 plan as a racial cleansing plan, then you cannot, in fairness and logic, say you did not at that time have awareness of your claims. I see that I'm out of time. If any other questions, I'll be seated. Thank you for your time. All right. Thank you, sir. All right. Back to you, Ms. Spies. You have rebuttal. Thank you, Your Honors. I want to just start by reading something from the defendant's brief. This is at page 35 of their brief before this court, where they say, Further, the major revisions to the land use plan in 2018, which included removing the two-mile and those thereafter. In Record on Appeal, page 819, in their brief below, they say, The invalidation of the land use plan does not guarantee the lack of future industrial construction and does nothing to redress the alleged diminution in property value. The lack of a formal land use plan does not prevent industrial construction or private companies from seeking land use permits. Rather, they would do so under less formalized rules and procedures. That's their brief, not ours. What we're talking about here in terms of Morgan and why it rejected the notice requirement is, in this court, in Heath, recalled this, that it expressly held that the date on which a plaintiff becomes aware that he or she has an actionable Title VII claim is of no regard in the context of determining the timeliness of that type of claim. In Heath, this court noted that, in Morgan, they were drawing into Title VII the continuing violation doctrine as it applies generally. When you cited Heath, and we've read the brief, I'm not sure it's exactly apropos, but why don't you spend the balance of your time, both counsels double-teamed you over there with a lot of points, so why don't you just respond to the various one-oneed on the standard points in terms of the 2014 plan. They basically say you're side-acquiesced in the plan, therefore, you can't make a claim. Let's hear your rebuttal to the arguments they were making. On the 2014 plan?  So... Essentially, they argue you can't satisfy the requisites of a continuing violation under our case law. They say 2014 is the triggering date, that's the focal date. These other things don't satisfy, so I'm just asking if you want to take the opportunity to respond or rebut their argument that these facts don't fit within the continuing violation doctrine. Understood, Your Honor. So with regard to the two decisions on the moratoria, those clearly, those are two very clear acts of discrimination by the parish, and even though the solar moratorium may have applied parish-wide, it was granted at the behest and in response to the concerns of residents in the white parts of the parish. And again, that was not pursuant to the land-use plan. The land-use plan didn't even deal with moratoria at that time. So that's another set of acts that are completely apart from the land-use plan. Another one is when the parish allowed one of the facilities to close off the only evacuation route for residents in the 5th District to get out in the event of a chemical release or an explosion, and that road closure is still maintained, and that wasn't pursuant to the land-use plan. Those two acts are clearly within the plan, and in Perez v. Laredo Junior College, one of the things the court noted there was that when you have the college or the state institution continuing to pay certain employees at a higher rate than the other employee who filed the unequal treatment claim, that is evidence of the policy in practice. And on this pattern in practice question, what we're saying is because this is a 1983 action, that is where we have to show the existence of a policy that is necessarily like a pattern in practice case. And these types of claims contemplate and indeed require the application of the doctrine, and I would just say, Your Honor, one more thing about 2014 and everything that came prior. It's not that we're trying to reach back for damages. We have a high burden to show intent to discriminate under Arlington Heights factors, and so in the 660 paragraphs of our complaint, we spend a lot of time pleading the facts which will show, which meet each one of those Arlington Heights factors. All right. We have a red light. For my purpose and my recollection, assuming arguendo, you don't prevail in this appeal, who remains at the 12B? Because the district court found some people had standing. In this case, we've got Rice and the church who are seeking a cert, so it's not an issue. Rattle off for me who's still, quote, standing, pun intended. All of the plaintiffs would have standing for different claims, Your Honor. We were addressing the property, the property, the court's ruling on property injury. Well, I know here we have the church, I'll try to rise to attempt to assert the religious discrimination claims, et cetera, et cetera. I mean, that's kind of at the heart of that. Just for the sake of me clearing my fog and having read all this, assuming you don't prevail on appeal, I'm not saying you're not. I'm just trying to get clear in my head who's left on the other claims. Inclusive is still in, right? Correct, Your Honor. And who else? Mount Triumph Baptist Church and Rice St. James because they have all pled health injuries and equal protection violations and violations of the 13th Amendment. So those are the claims that irrespective of what you do are still there for whatever the next step may be, right? Is that reasonably clear? That's still in the district court. Yes, Your Honor. Just waiting whatever happens here. I assume those were 12 people. Maybe that's not right. Anyway, we can figure it out. Counselor's shaking her head so they have to agree. I'm just trying to clear up because this isn't a case where everybody's poured out. In this case, the district court found standing as to some plaintiffs, didn't find standing as to others. Right, but statute of limitations. Yeah, but found statute of limitations. So it can get a little bit testy just trying to parse out who's on first, who's on second, who remains in the case because the case is still there. And I thought you could rat it off for me real fast just so I knew. But that's okay. We'll figure it out. And did I do that, Your Honor? Maybe. All right. Well, it's a hefty case. It's very interesting issues. We appreciate the robust briefing and the oral argument that counsel provided. We'll take it under submission and we'll figure it out as best we can and do kudos to the students. Mr. Quigley, do a great job. Been doing it for a long time, mentoring the young people over there to argue. This case will be submitted. And before we take up the third case, the panel will stand in a short recess. Thank you, Your Honor.